UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

L.B. and J.B., *individually, and on behalf of S.B., a minor*,

                                    Plaintiffs,

              v.

KATONAH-LEWISBORO UNION FREE SCHOOL DISTRICT,

                                    Defendant.

Case No. 14-CV-6805 (KMK)

OPINION & ORDER

<u>Appearances</u>

Peter D. Hoffman, Esq.
Law Office of Peter D. Hoffman, PC
Katonah, NY
*Counsel for Plaintiffs*

Daniel Petigrow, Esq.
James P. Drohan, Esq.
David H. Strong, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        L.B. and J.B. (collectively, "Plaintiffs"), bring this Action individually, and on behalf of

their child S.B., pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.

§ 1400 *et seq.*, seeking to overturn the State Review Officer's determination that Plaintiffs are

not entitled to compensatory education as a remedy for the alleged failure of the Katonah-

Lewisboro Union Free School District ("Defendant," or the "District") to provide a free

appropriate public education ("FAPE") to S.B. during the 2011-12 and 2012-13 school years, as

well as that the District is not required to reimburse Plaintiffs for their unilateral placement of

S.B. at Westfield Day School ("Westfield") for the 2012-13 and 2013-14 school years.  (Dkt. No. 27.)  Before the Court is Plaintiffs' Motion for Summary Judgment ("Motion").  (Dkt. No. 55.)  For the reasons set forth below, Plaintiffs' Motion is denied.

## I.  Background

### A.  Factual Background

Because district courts generally owe appropriate deference to the findings of fact made by a the State Review Officer ("SRO"), *see S.A. ex rel. M.A.K. v. N.Y.C. Dep't of Educ.*, No. 12-CV-435, 2014 WL 1311761, at *1 (E.D.N.Y. Mar. 30, 2014) (noting that the district court "is not an expert on education or childhood learning disabilities" and thus awarding "appropriate deference" to "[t]he SRO's findings of fact"), this Court adopts the SRO's factual findings as its own unless otherwise noted below, *see id.* (adopting "the SRO's findings of fact as its own unless otherwise noted"); *T.L. ex rel. B.L. v. Dep't of Educ.*, No. 10-CV-3125, 2012 WL 1107652, at *1 n.1 (E.D.N.Y. Mar. 30, 2012) (giving "the SRO's well-supported findings of fact . . . due deference" and "therefore adopt[ing] the SRO's findings of fact as its own" (internal quotation marks omitted)).  For the sake of convenience, however, the facts relevant to the instant determination are as follows.[1]

---

[1] There are considerable conflicts in the facts as presented by the Parties.  (*Compare generally* Pls.' Local Civil Rule 56.1 Statement of Material Facts ("Pls.' 56.1") (Dkt. No. 58), *with* Def.'s Resp. to Pls.' Local Civil Rule 56.1 Statement and Local Civil Rule 56.1 Counter-Statement of Material Facts ("Def.'s 56.1") (Dkt. No. 60).)  However, because the SRO's well-supported findings of fact are entitled to deference, *see S.A.*, 2014 WL 1311761, at *1; *T.L.*, 2012 WL 1107652, at *1 n.1, this Court adheres to the facts as set forth in that decision, (*see* State Review Officer Decision ("SRO Op.") 3–9), unless doing so would be contrary to the weight of the evidence.

1.  S.B.'s Educational History

S.B. is a child with a disability.  (State Review Officer Decision ("SRO Op.") 3.)  There is no dispute as to his eligibility for special education programs and related services as a student with an other health impairment.  (*Id.* at 3 n.1; *cf.* J-6; J-8; P-II.)[2]  Since moving to the District prior to the 2004-05 school year, S.B. received special education services from the District, consisting of resource room services and, at unspecified times, speech-language therapy.  (SRO Op. 3 (citing J-22); *see also* Tr. 2280.)

On June 3, 2011, a Committee on Special Education ("CSE") convened to develop S.B.'s Individualized Education Program ("IEP") for the 2011-12 school year, when he would enter the tenth grade.  (SRO Op. 3 (citing J-3).)  The June 2011 CSE recommended one 40-minute session of resource room daily in a 5:1 ratio, as well as one 30-minute session of counseling per week in a 5:1 ratio.  (*Id.* (citing J-3).)  The June 2011 CSE further recommended additional supports and modifications, such as scaffolded study guides, checks for understanding, additional time for long-term projects, the breaking down of directions and tasks into smaller components, and the use of a graphic organizer.  (*Id.* (citing J-3).)

The CSE reconvened on December 2, 2011 to consider Plaintiffs' request for additional resource room services for S.B.  (*Id.* (citing J-4).)  Following discussion on the issue, the December 2011 CSE declined to add another resource room in S.B.'s IEP.  (*Id.* (citing J-4).)  However, the December 2011 IEP indicated that his English and Global Studies teachers offered to provide "extra help" to S.B. and to "collaborate with [his resource room teacher] on a weekly

---

[2] As used herein, Joint Exhibits from the underlying administrative proceeding are identified by "J-," District exhibits are identified by "D-," and Plaintiffs' exhibits are identified by "P-."  "IHO-" refers to Impartial Hearing Officer Exhibits, and "Tr.-" refers to the pages of the transcript from the impartial hearing.

basis." (*Id.* (alteration in original) (quoting J-4).) The IEP further stated that the CSE would "reconvene at the end of January [2012] to discuss whether this plan [was] enough to address [S.B.'s] educational needs." (*Id.* (first and second alterations in original) (quoting J-4).) As an added support, the December 2011 IEP provided that S.B.'s regular education teachers, in collaboration with his resource room teacher, would modify S.B.'s curriculum/classwork and homework assignments. (*Id.* (citing J-4).)

The CSE reconvened on January 31, 2012 and concluded that the "extra help" described in the December 2011 IEP "ha[d] worked," though "not consistently as [S.B.] d[id] not always cho[o]se to go" to additional help sessions with his teachers. (*Id.* (first and third alterations in original) (quoting J-5).) The January 2012 IEP added a testing accommodation for S.B. whereby he would take all Global Studies tests in a separate location. (*Id.* (citing J-5).)

On April 13, 2012, the CSE recommended that S.B.'s counseling services be provided on an individual basis, though such a change was not made to his April 2012 IEP. (*Id.* at 4 (citing J-6).) The April 2012 CSE also recommended that the District conduct a functional behavioral assessment ("FBA") and develop a behavioral intervention plan ("BIP"). (*Id.* (citing J-6).) Placement in a special class for English was discussed but not recommended. (*Id.* (citing J-6).) In an email to the District, dated April 18, 2012, Plaintiffs disavowed any interest in such placement. (*Id.* at 4 n.2 (citing D-16).)

At a meeting on June 4, 2012, the CSE added one 30-minute session of individual counseling per week to S.B.'s IEP and added access to a word processor/computer as a testing accommodation for Social Studies and English examinations. (*Id.* at 4 (citing J-7).) In a letter dated October 12, 2012, Plaintiffs "reject[ed]" the June 2012 IEP as "not appropriate." (*Id.* (alteration in original) (quoting P-B).) Plaintiffs stated that they would place S.B. at Westfield

and "demand[ed] tuition reimbursement" from the District as well as the cost of "transportation to and from Westfield." (*Id.* (alteration in original) (quoting P-B).)  Plaintiffs removed S.B. from the public school on October 16, 2012, (*id.* (citing D-21)), and the District acknowledged receipt of their completed "Withdrawal of Student Form" in a letter dated October 19, 2012, (*id.* (citing D-22)).

On October 25, 2012, the CSE convened to discuss a private evaluation of S.B. by a clinical neuropsychologist, which Plaintiffs had obtained and provided to the District. (*Id.* (citing J-8; J-22).)  Upon consideration of this evaluation, the October 2012 CSE amended S.B.'s preexisting educational program to include a 15:l+l special class for English and Social Studies, one 30-minute session of individual speech-language therapy per week, and one 30-minute session of small group speech-language therapy per week. (*Id.* (citing J-8).)  In addition, the October 2012 CSE added access to a word processor/computer as a supplementary aid/service and flexible scheduling as a testing accommodation. (*Id.* (citing J-8).)  The IEP also reflected that Plaintiffs informed the CSE that it was their "intention to have [S.B.] continue [at Westfield]." (*Id.* (second alteration in original) (quoting J-8).)

On June 3, 2013, the CSE reconvened to conduct S.B.'s annual review. (*Id.* (citing J-31).)  After considering a progress report card and letter submitted by Westfield, (J-29; J-30), as well as updated information provided by J.B., (J-24), the CSE recommended for the 2013-14 school year "continuation of all IEP program[ming] [and] service[s]" from the October 2012 IEP, (SRO Op. 4 (alterations in original) (quoting J-31)).  The June 2013 IEP reflects that Plaintiffs rejected that program at the CSE meeting. (*Id.* (citing J-31).)

On August 28, 2013, the CSE reconvened to consider evaluations of S.B. recently conducted by the District as well as materials submitted by Plaintiffs. (*Id.* at 5 (citing J-40).)

The August 2013 CSE revised S.B.'s speech goals "to more accurately reflect [his] needs as per the evaluations" and, aside from removing its special class recommendation for Social Studies, maintained its prior program recommendations.  (*Id.* (quoting J-40).)  In a letter dated September 6, 2013, Plaintiffs rejected the August 2013 IEP.  (*Id.* (citing J-41).)  Plaintiffs indicated that S.B. would attend Westfield during the 2013-14 school year and that they "reserv[ed] the right" to seek the costs of S.B.'s education as well as "mileage to and from . . . Westfield" for the 2013-14 school year.  (*Id.* (alterations in original) (quoting J-41).)

## 2.  Due Process Complaint

Plaintiffs, individually and on behalf of their son S.B., filed a due process complaint notice against the District on January 2, 2013.  (*Id.* (citing IHO-1).)  In their second amended process complaint notice, dated September 10, 2013, Plaintiffs alleged that the District failed to offer S.B. a FAPE for the 2011-12, 2012-13, and 2013-14 school years and further, that it failed to implement S.B.'s IEPs during the 2011-12 and 2012-13 school years.  (*Id.* (citing IHO-10).)[3] For relief, Plaintiffs sought compensatory education and, for the 2012-13 and 2013-14 school years, the costs of S.B.'s tuition at Westfield.  (*Id.* (citing IHO-10).)  Plaintiffs additionally requested reimbursement for "mileage costs for transportation" associated with S.B.'s attendance at Westfield for the 2012-13 and 2013-14 school years.  (*Id.* at 6 (quoting IHO-10).)

### a.  Impartial Hearing Officer's Decision

The impartial hearing took place over 13 days between May 2013 and November 2013. (*Id.* (citing Tr. 1–2664).)  As noted by the SRO, (*see id.* at 7), the IHO's 81-page decision provides a comprehensive review of the testimonial evidence adduced during those proceedings,

---

[3] The second amended due process complaint also raised an issue regarding the District's disclosure of confidential information.  (IHO-10.)  However, that issue was not addressed by the Impartial Hearing Officer ("IHO"), and Plaintiffs did not pursue it on appeal.  (SRO Op. 5 n.6.)

(*see* Impartial Hearing Officer Findings of Fact and Decision ("IHO Op.") 3–59). The Court, therefore, merely identifies those individuals whose testimony will bear on the resolution of the instant Motion:

- Dr. Catherine McNulty ("McNulty"), Special Education Supervisor for the District;

- Connie Hayes ("Hayes"), Director of Special Services for the District;

- Jennifer Lovallo ("Lovallo"), the school psychologist responsible for S.B.'s counseling services;

- Mark Nedell ("Nedell"), S.B.'s ninth grade teacher for academic support lab;

- Paul LoFaso ("LoFaso"), S.B.'s resource room teacher in his tenth grade year;

- Kathleen Anderson ("Anderson"), a certified school psychologist who evaluated S.B. in June 2013;

- Terri Lynn Wuensch, a speech language pathologist employed by the District;

- Jeanetta Bryant ("Bryant"), S.B.'s tenth grade English teacher;

- Pamela Heldman ("Heldman"), Academic Director and Assistant Director of Administration at Westfield;

- Dr. Melanie Egnal ("Egnal"), the clinical neuropsychologist who evaluated S.B. in May/June 2012 and again in June 2013;

- Dr. Robin Jilton ("Jilton"), a private psychologist who first evaluated S.B. in March 2011 and worked with him until January 2013;

- J.B., S.B.'s mother;

- Vicki LePage ("LePage"), Plaintiffs' educational consultant.

In a decision dated February 21, 2014, the Impartial Hearing Officer ("IHO") found that the District offered S.B. a FAPE for the 2011-12, 2012-13, and 2013-14 school years. (SRO Op. 6 (citing IHO Op. 63–72, 81).) The IHO accordingly denied Plaintiffs' requested relief. (*Id.* (citing IHO Op. 80–81).)

7

Having concluded that the District offered the student a FAPE for the 2011-12, 2012-13, and 2013-14 school years, the IHO observed that she need not issue findings as to the appropriateness of Westfield or as to equitable considerations related to compensating Plaintiffs for the costs of having S.B. attend Westfield.  (*Id.* at 8 (citing IHO Op. 72, 78).)  Nevertheless, the IHO found, in the alternative, that Westfield was an inappropriate unilateral placement because Plaintiffs failed to introduce evidence that Westfield provided S.B. with specially designed instruction.  (*Id.* (citing IHO Op. 74–75).)  The IHO also issued alternative findings as to equitable considerations.  (*Id.* at 9 (citing IHO Op. 78–80).)  She found that Plaintiffs' failure to provide adequate notice of the S.B.'s removal from the District during the 2012-13 school year would have resulted in a complete denial of tuition reimbursement.  (*Id.* (citing IHO Op. 78–79).)  As for the 2013-14 school year, however, the IHO found that the District was aware of Plaintiffs' dissatisfaction with S.B.'s program because the impartial hearing commenced prior to the start of the school year and thus noted she would not have denied relief on that basis.  (*Id.* (citing IHO Op. 79).)  Highlighting arguments that "were distractions at best" and "several occasions on which [she] had to admonish counsel, parties, and witnesses," the IHO further noted that neither Party's conduct weighed in favor or against Plaintiffs' requested relief.  (*Id.* (alteration in original) (quoting IHO Op. 80).)  Lastly, the IHO denied Plaintiffs' request for transportation costs for the 2013-14 school year, considering that the District offered, but Plaintiffs declined, bus transportation for S.B. for the 2013-14 school year.  (*Id.* (citing IHO Op. 80).)[4]

---

[4] Plaintiffs' request for transportation costs for the 2012-2013 school year was withdrawn during the impartial hearing.  (IHO Op. 1 (citing Tr. 2270).)

b.  State Review Officer's Decision

Plaintiffs timely appealed the IHO's Decision to the New York Office of State Review ("OSR") seeking to reverse the IHO's decision denying compensatory education for the 2011-12 and 2012-13 school years, denying tuition reimbursement for the 2012-13 and 2013-14 school years, and denying transportation costs for the 2013-14 school year.  (*Id.*)[5]  The SRO rendered a decision on September 30, 2014, dismissing Plaintiffs' appeal.  (*Id.* at 1, 17.)[6]  Specifically adopting the IHO's findings and conclusions with respect to the design and implementation of S.B.'s IEPs, (*id.* at 15), the SRO affirmed the IHO's conclusion that the District offered S.B. a FAPE for the 2011-12, 2012-13, and 2013-14 school years, (*id.* at 16).  The SRO thereby determined that it need not reach the issue of whether Westfield was appropriate for S.B. or whether equitable considerations supported Plaintiffs' reimbursement claim.  (*Id.* at 16–17.)

B.  Procedural Background

On August 22, 2014, Plaintiffs commenced this Action against the District as well as the New York State Education Department, John B. King, Jr. in his representative role as Commissioner of Education for the New York State Education Department, OSR, and SRO Justyn P. Bates (collectively, "State Defendants").  (Dkt. No. 1.)  The District filed its Answer to the Complaint on November 3, 2014, (Dkt. No. 12), and moved for judgment on the pleadings on December 16, 2014, (Dkt. Nos. 15–17).  On December 17, 2014, State Defendants moved to dismiss the Complaint.  (Dkt. Nos. 18–20.)

---

[5] Notwithstanding the District's argument to the contrary, the SRO determined that Plaintiffs served their petition in a timely manner and thus properly initiated the appeal.  (SRO Op. 13.)

[6] Plaintiffs point out that the SRO's decision was over four months late and rendered only after they had commenced this Action.  (*See* Pls.' 56.1 ¶ 13.)  The District does not dispute this fact.  (*See* Def.'s 56.1 ¶ 13.)

Plaintiffs filed their Amended Complaint on January 30, 2015.  (Dkt. No. 27.)  The

District filed its Answer to the Amended Complaint on February 13, 2015.  (Dkt. No. 30.)  On

March 18, 2015, State Defendants submitted a Motion to Dismiss the Amended Complaint along

with supporting papers.  (Dkt. Nos. 31–33.)  Plaintiffs submitted their opposition papers on May

1, 2015, (Dkt. Nos. 41–42), and State Defendants submitted their reply on May 22, 2015, (Dkt.

Nos. 43–44).  The Court held oral argument on September 9, 2015 with respect to the then-

pending motions.  (*See* Dkt. (minute entry for Sept. 9, 2015).)  By Order dated September 10,

2015, the Court denied the District's Motion for Judgment on the Pleadings as to the Complaint

as moot, denied State Defendants' Motion to Dismiss the Complaint as moot, and granted State

Defendants' Motion to Dismiss the Amended Complaint.  (Dkt. No. 52.)

Pursuant to a briefing schedule adopted by the Court on September 22, 2015, (Dkt. No.

54), Plaintiffs filed their Motion for Summary Judgment and accompanying papers on November

16, 2015, (Dkt. Nos. 55–58).  The District submitted its opposition papers on December 16,

2015, (Dkt. No. 60–61), and Plaintiffs submitted a reply on January 15, 2016, (Dkt. No. 64).  The

Parties rely exclusively on the administrative record, having submitted no additional evidence.[7]

## II.  Discussion

### A.  Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public

education" to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *see also Bd. of Educ. v.*

*Rowley*, 458 U.S. 176, 179 (1982) (describing the IDEA's predecessor statute as an "ambitious

federal effort to promote the education of handicapped children").  A school district provides a

---

[7] While the Parties did submit competing Rule 56.1 statements, those statements drew
exclusively from the administrative record.  (*See generally* Pls.' 56.1; Def.'s 56.1.)

FAPE when it offers "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citation and some internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 207).  These services are set forth in the child's IEP, "the central mechanism by which public schools ensure that their disabled students receive a [FAPE]."  *Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002); *see also* 20 U.S.C. §§ 1414(d)(1)(A)–(B), (d)(3) (setting out requirements for IEPs and their development).

"The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012).  Rather, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).  "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'"  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).  Indeed, the IDEA does not require schools to "maximize the potential" of students with disabilities, but instead was intended "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."  *M.H.*, 685 F.3d at 245 (internal quotation marks omitted).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a).  The IHO's

decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A); *see also M.H.*, 685 F.3d at 224–26 (generally describing the IHO and SRO process).

The Supreme Court has repeatedly held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from the school district for the private placement of their child. *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). The IDEA allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate." *Forest Grove*, 557 U.S. at 237 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). However, parents who unilaterally withdraw their child from the public schools in favor of a private placement do so at their own financial risk. *See A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009).

In deciding whether tuition reimbursement for such a private placement is warranted, a court must first consider (1) "whether the state has complied with the procedures set forth in the IDEA," and (2) "whether the IEP developed through the [IDEA's] procedures is reasonably calculated to enable the child to receive educational benefits." *Cerra*, 427 F.3d at 192 (alteration and internal quotation marks omitted). If the answer to these questions is yes, no reimbursement is permissible. *See id.* ("If these requirements are met, the State has complied with the obligations imposed by Congress[,] and the courts can require no more." (internal quotation marks omitted)). If no, the court then considers (3) "whether the private schooling obtained by the parents is appropriate to the child's needs." *Id.* If it is, "equitable considerations" must

12

"support the [parents'] claim." *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 205 (S.D.N.Y. 2010);

*see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363–64 (2d Cir. 2006) ("[E]quitable

considerations [relating to the reasonableness of the action taken by the parents] are relevant in

fashioning relief." (second alteration in original) (quoting *Burlington*, 471 U.S. at 374)).

Because a court may order "such relief" as it deems "appropriate," 20 U.S.C.

§ 1415(i)(2)(C)(iii), and because a reimbursement award is discretionary, *see id.*

§ 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the

parents for the cost of [private] enrollment . . . ."), courts "enjoy[] broad discretion in considering

equitable factors relevant to fashioning relief," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d

105, 112 (2d Cir. 2007) (citing *Carter*, 510 U.S. at 16).

B.  Standard of Review

Unlike with an ordinary summary judgment motion, the existence of a disputed issue of

material fact will not necessarily defeat a motion for summary judgment in the IDEA context.

*See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per

curiam).  Rather, "the procedure [in IDEA cases] is in substance an appeal from an

administrative determination, not a summary judgment motion."  *M.H.*, 685 F.3d at 226

(alteration and internal quotation marks omitted).

This posture means that the court owes "a significant degree of deference to the state

educational agency, as [it is] essentially acting in an administrative-law-style capacity."  *Mr. &

Mrs. P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008).  The court "must

give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally

'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult

questions of educational policy.'"  *Gagliardo*, 489 F.3d at 113 (second alteration in original)

(quoting *Rowley*, 458 U.S. at 206); *see also Cerra*, 427 F.3d at 191 (explaining that the "IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy").  While a reviewing court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," *M.H.*, 685 F.3d at 240 (internal quotation marks omitted), such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," *Rowley*, 458 U.S. at 206.  Rather, the standard for reviewing administrative determinations "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review.  In the course of this oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale."  *M.H.*, 685 F.3d at 244 (alterations, italics, and internal quotation marks omitted).

"Deference is particularly appropriate when . . . the [SRO's] review has been thorough and careful."  *Mr. & Mrs. P.*, 546 F.3d at 118 (alteration in original) (quoting *Walczak*, 142 F.3d at 129).  Specifically,

> the deference owed to an SRO's decision depends on the quality of that opinion. Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation marks omitted); *see also M.H.*, 685 F.3d at 241 ("The SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." (quoting *Gagliardo*, 489 F.3d at 114)).  This deference is further amplified when the IHO and SRO reach the same conclusion based on the same record before a court.  *See B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343,

360 (E.D.N.Y. 2014) ("[D]eference is particularly apt where the IHO and SRO decisions are in

agreement and are based on the same record as that before the district court."). Additionally, the

Second Circuit has instructed courts that deference to an SRO's decision is more appropriate

when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue;

when the decision involves a dispute over an appropriate educational methodology versus

determinations regarding objective indications of progress; and when the district court's decision

is based solely on the administrative record that was before the SRO. *See M.H.*, 685 F.3d at 244.

### C. Application

As noted above, to recover on their tuition reimbursement claim, Plaintiffs must

demonstrate that the District failed to offer S.B. a FAPE, that their unilateral placement of S.B.

was appropriate, and that the equities support reimbursement. The Court thus first assesses

whether "the [District] has complied with the procedures set forth in the IDEA," and whether the

IEPs "developed through the [IDEA]'s procedures [were] reasonably calculated to enable [S.B.]

to receive educational benefits." *Cerra*, 427 F.3d at 192 (alteration and internal quotation marks

omitted).

As an initial matter, the Court finds that Plaintiffs have not shown that deference to the

SRO's conclusion is unwarranted.[8]  The SRO's decision reflects a comprehensive review of the

---

[8] Even if the Court agreed with Plaintiffs that the SRO's decision does not warrant
deference due to insufficient reasoning, (*see* Pls.' Reply Mem. of Law ("Pls.' Reply") 1 (Dkt.
No. 64)), the Court would instead "consider the IHO's analysis, which is also informed by
greater educational expertise than that of judges, rather than . . . rely exclusively on its own less
informed educational judgment," *P.L. v. N.Y. Dep't of Educ.*, 56 F. Supp. 3d 147, 159 (E.D.N.Y.
2014) (quoting *M.H.*, 685 F.3d at 246); *see also R.E.*, 694 F.3d at 189 (explaining that a court
"must defer to the SRO's decision on matters requiring educational expertise unless it concludes
that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may
be considered instead"). The ultimate effect would be the same, as the SRO unequivocally
adopted the IHO's thorough findings and conclusions as to S.B.'s IEPs for the 2011-12, 2012-13,
and 2013-14 school years. (*See* SRO Op. 15.)

record and clearly articulates the well-reasoned conclusions of the IHO, (*see* SRO Op. 6–8, 14–16), which it adopts, (*see id.* at 15).  The SRO additionally parsed two claims presented by Plaintiffs on appeal, providing ample citations to the record and to case law in support of each finding.  (*See id.* at 14.)  Because "[c]ourts generally defer to the final decision of the state authorities" if the "review has been thorough and careful," *M.H.*, 685 F.3d at 241 (internal quotation marks omitted), and because the SRO's findings are supported by the evidence, the SRO's decision is entitled to deference.[9]  In this case, the SRO agreed that the District demonstrated that it offered S.B. a FAPE for the 2011-12, 2012-13, and 2013-14 school years. (SRO Op. 16.)

### 1.  Whether the IEPs Offered S.B. a FAPE for the 2011-12 School Year

Adopting the IHO's findings and conclusions, (*see id.* at 15), the SRO affirmed that the District offered S.B. a FAPE for the 2011-12 school year, (*id.* at 16).  In its thorough decision,

---

[9] Plaintiffs complain that "[t]he SRO did not address the second and third prongs of the *Burlington* test," (Pls.' Reply 1), which consider whether "the unilateral private placement was appropriate" and "whether the equities favor reimbursement," *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 513, 515 (S.D.N.Y. 2013).  The SRO, however, had no obligation to do so after having concluded that that the challenged IEPs were adequate.  *See M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end."); *D.D-S. v. Southold Union Free Sch. Dist.*, No. 09-CV-5026, 2011 WL 3919040, at *13 (E.D.N.Y. Sept. 2, 2011) (concluding "that the IEP was procedurally and substantively appropriate" such that the court "need not address the adequacy of [the private placement]"), *aff'd*, 506 F. App'x 80 (2d Cir. 2012).

Plaintiffs also argue that "this Court [should] reject the SRO's findings in whole" because "the SRO's decision was egregiously late."  (Pls.' Reply 1 (internal quotation marks omitted).) "However, no authority permits courts to give less respect to SRO decisions on the basis of delay, nor is there any logical reason to do so."  *P.S. v. N.Y.C. Dep't of Educ.*, No. 13-CV-4772, 2014 WL 3673603, at *7 n.3 (S.D.N.Y. July 24, 2014); *see also M.L. v. N.Y.C. Dep't of Educ.*, No. 13-CV-574, 2014 WL 1301957, at *13 (S.D.N.Y. Mar. 31, 2014) (acknowledging "that the [SRO's] routine delays in issuing decisions is problematic" but finding "no authority in IDEA cases that allows [a court] to declare the SRO's decision a nullity" (internal quotation marks omitted)).

the IHO found that:  (a) S.B. passed all of his courses in tenth grade, (IHO Op. 63), and his social

isolation did not impact him academically, (*id.* at 64); (b) the District's reduction of non-essential

writing assignments, as needed, demonstrated a conscientious effort to meet S.B.'s needs, (*id.*);

(c) the District was not required to provide a written plan to Plaintiffs regarding the reduction of

S.B.'s assignments, although the IEP did refer to modified classwork/homework, and there were

a number of written communications about the reduction, (*id.*); (d) the CSE appropriately

determined not to add a second resource room for S.B., as he was not using his first resource

room productively, and there was no educational reason provided in support of that request, (*id.*

at 64–65); (e) the plan for S.B. to receive extra help directly from his English and Global Studies

teachers was well-intentioned and beneficial to S.B., (*id.* at 65); (f) the District appropriately

offered to place S.B. in a 15:1 special class for English, but this option was rejected by J.B., (*id.*

at 66); and (g) the District conducted an appropriate, timely FBA, and the resulting BIP, though

not fully implemented at the end of the 2011-12 school year, did not deny S.B. a FAPE because

his behavioral needs were being adequately addressed, (*id.* at 66–67).

### a.  Procedural Adequacy

This "initial procedural inquiry . . . is no mere formality, as adequate compliance with the

procedures prescribed would in most cases assure much if not all of what Congress wished in the

way of substantive content in an IEP."  *A.C.*, 553 F.3d at 172 (internal quotation marks omitted).

Nonetheless, not "every procedural error in the development of an IEP renders that IEP legally

inadequate under the IDEA."  *Id.* (internal quotation marks omitted).  For procedures to be

sufficient, they must provide

> [a]n opportunity for the parents of a child with a disability to examine all records
> relating to such child and to participate in meetings with respect to the
> identification, evaluation, and educational placement of the child, and the provision

of a [FAPE] to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1).  Inadequate procedures warrant reimbursement only if, individually or cumulatively, they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decision[-]making process," or "caused a deprivation of educational benefits."  *R.E.*, 694 F.3d at 190 (first alteration in original) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) ("[P]arents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process.").  "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."  *R.E.*, 694 F.3d at 190.

Plaintiffs argue that the District failed to adhere to proper procedures in developing the 2011-12 IEPs because (a) the District failed to conduct a timely FBA and devise an appropriate BIP; (b) Plaintiffs were never provided with a written plan articulating the reduction in S.B.'s assignments, and the District failed to adequately document that reduction; and (c) the plan for S.B. to receive additional teacher assistance was inappropriate.  (*See* Pls.' Mem. of Law in Supp. of Mot. ("Pls.' Mem.") 7–12 (Dkt. No. 57).)  Each claim will be addressed in turn.

### i.  FBA/BIP

First, Plaintiffs allege that the District "failed to conduct an appropriate FBA, resulting in a flawed BIP."  (*Id.* at 9 (citation omitted).)  They do not, however, offer any compelling reason for this Court to second-guess the IHO's decision to credit Lovallo's testimony that an FBA was not warranted prior to spring 2012, as it was not until then that S.B.'s academic decline was "precipitous."  (IHO Op. 66.)  Moreover, contrary to Plaintiffs' claim, (*see* Pls.' Mem. 9 (citing N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8 § 200.22 (a)(2))), the record readily confirms

the IHO's "find[ing] that multiple sources were used in the development of the FBA," (IHO Op.

67; *see also* SRO Op. 15 (adopting the IHO's conclusion that "the June 2012 FBA and BIP were

developed in conformity with State regulations")), which took four weeks to complete, (*see* Tr.

489). These sources include classroom observation, (*see id.* at 489–90; J-20), multiple

interviews with S.B., (*see* Tr. 490–91, 499; J-20), review of S.B.'s clinical file, (*see* Tr. 493; J-

20), and interviews with S.B.'s teachers, (*see* Tr. 491, 493; J-20).[10]  In addition, Lovallo testified

that she considered prior conversations with J.B. and Jilton in completing the FBA.  (Tr. 491–92,

973, 979.)  Though Lovallo did not formally interview Plaintiffs, (*see id.* at 1063), the requisite

"multiple sources of data" explicitly includes "any relevant information provided by the

student's parent" but at no point mandates—much less mentions—an *interview* with the

student's parent, *see* NYCRR tit. 8 § 200.22(a)(2); *cf. M.L. v. N.Y.C. Dep't of Educ.*, No. 13-CV-

2314, 2015 WL 1439698, at *8 (E.D.N.Y. Mar. 27, 2015) (finding the requirements of

§ 200.22(a)(2) satisfied by an FBA based upon classroom observation, information provided by

school staff, and "a comprehensive psychological evaluation"); *B.K.*, 12 F. Supp. 3d at 364–65

(finding the requirement for "multiple sources of data" satisfied where "[the student's] FBA (and

thus his BIP) was predicated on verbal and written assessments by [private school] staff,

progress reports from [the student's] therapists, and . . . on-site observations" (internal quotation

marks omitted)).

---

[10] Plaintiffs concede that "Lovallo did interview S[.]B[.]" but nonetheless complain that "his input is not identified in the FBA."  (Pls.' Mem. 9.)  However, Plaintiffs at no point set forth any legal requirement—let alone persuasive justification—that such input be expressly enumerated.  (*See id.* at 9–10; Pls.' Reply 4–5.)  Rather, the relevant regulations merely require that "[t]he FBA . . . be based on multiple sources of data," which includes, inter alia, "information from the student."  NYCRR tit. 8 § 200.22(a)(2).  Lovallo's testimony makes clear that "S.[B.]'s own self-reporting" figured "prevalently" in her evaluation.  (Tr. 499.)

Plaintiffs further allege that there was no "schedule to measure the effectiveness of the [BIP]." (Pls.' Mem. 9.) Yet, the BIP itself explicitly identifies how the intervention is measured, who is responsible for recording data, and the timeline for review of the plan (6/2012, 9/2012, 11/2012, 1/2013, 4/2013, and 6/2013). (*See* J-21).[11] Plaintiffs also ignore the fact that Lovallo reviewed the FBA and draft BIP with J.B. and Jilton, (*see* Tr. 491–92, 499–501, 970–71, 973, 2423–24), both of whom expressed their satisfaction, (*see, e.g.*, *id.* at 501 (testimony by Lovallo as to J.B.'s statement that the draft BIP "was very thorough"); *id.* at 971 (testimony by Lovallo that Jilton "was very pleased with the [BIP]" and "didn't feel anything needed to be amended")). The FBA and BIP subsequently were reviewed at the CSE meeting on June 4, 2012 and adopted without objection, (*see* J-7), a point highlighted by the IHO and the SRO alike, (*see* IHO Op. 67; SRO Op. 7). In fact, J.B. signed the document, (J-21; *see also* Tr. 501), and only rejected the BIP as inappropriate upon signing the contract with Westfield four months later, (*see* IHO Op. 67 (citing P-A, P-OO)).[12]

---

[11] It also warrants mention that courts are generally "reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress." *P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011), *aff'd*, 526 F. App'x 135 (2d Cir. 2013).

[12] In any event, the failure to conduct an adequate FBA "does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190. Here, the 2011-12 IEPs acknowledged S.B.'s difficulty in completing assignments in a timely manner, included study skill goals designed to work on those deficits, and provided S.B. with additional time to complete long-term projects and with modified homework assignments. (*See* J-4; J-5; J-6.) The IHO found this program to be reasonably calculated to allow S.B. to receive educational benefits, (*see* IHO Op. 63, 67), and whether an IEP adequately addresses a student's behaviors and whether strategies for dealing with those behaviors are appropriate are "precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers," *A.C.*, 553 F.3d at 172 (internal quotation marks omitted).

Nonetheless, Plaintiffs contend "[n]ot only does the SRO ignore the substantive and procedural inadequacies in the FBA/BIP, but he also completely ignores the fact that the District made no attempt to implement the BIP in the remainder of the 2011-12 school year after determining S[.]B[.] was in need of an FBA/BIP."  (Pls.' Mem. 8.)  The Court finds this statement wholly inaccurate, given the SRO's acknowledgment that "the IHO agreed with [Plaintiffs] that the BIP was not implemented in the 2011-12 school year," but determined "that this did not result in a denial of FAPE because the BIP 'was only adopted [in June 2012] days before final exams and the end of the school year.'"  (SRO Op. 7 (alteration in original) (quoting IHO Op. 67).)  The IHO found that the failure to implement the BIP during the 2011-12 school year "is not enough to find [the] [D]istrict has not provided a FAPE to [S.B.]," (IHO Op. 67), and, considering the variety of other strategies used to address S.B.'s behavior (such as counseling services and extra help), (*see* J-4; J-5; J-6; *cf.* Tr. 221), the Court agrees, *see T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009) (finding that the failure to create an FBA or a BIP did not deny a FAPE where the IEP contained other means to address the student's behavior); *FB v. N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 583 (S.D.N.Y. 2013) (deferring to "the SRO's finding that the lack of a[n] FBA and a BIP did not deny [the student] a FAPE," in part because of evidence in the record of other means to address the student's behavior).

### ii.  Reduction in Assignments

Plaintiffs also allege that they did not have the opportunity to participate in the decision-making process "because [they] were never provided with a written plan explaining how S.B.'s assignments would be reduced or 'modified.'"  (Pls.' Mem. 10.)  In her decision, however, the IHO noted that she could "find no authority for extending parental rights established under [the] IDEA to a written plan concerning curriculum requirements to be provided to a parent."  (IHO

Op. 64 (citing *Winkelman ex. rel. Winkelman v. City Sch. Dist.*, 550 U.S. 516 (2007)).)  Indeed,

Plaintiffs have offered no such authority.  In any event, the record reveals that Plaintiffs did, in

fact, "play[] a significant role in this process."  *Winkelman*, 550 U.S. at 524 (internal quotation

marks omitted).[13]  J.B., Jilton, and LePage attended the November 7, 2011 CSE meeting where

the reduction of writing assignments was discussed.  (*See* Tr. 459–61, 613, 2301.)[14]  The

reduction was again discussed, then formally added to S.B.'s IEP, during the December 2, 2011

CSE meeting, at which J.B., Jilton, and LePage were all present.  (*See id.* at 461; J-4.)

Moreover, notwithstanding Plaintiffs' unsubstantiated claim to the contrary, (*see* Pls.' Local

Civil Rule 56.1 Statement of Material Facts ("Pls.' 56.1") ¶ 46 (Dkt. No. 58)), the December

2011 IEP was amended to reflect the reduction in assignments, (*see* Tr. 460–61; J-4).[15]

---

[13] It bears noting that the Supreme Court explained that this "significant role" pertains to the general process of developing an IEP.  *Winkelman*, 550 U.S. at 524 (internal quotation marks omitted).  As made clear by the myriad of Plaintiffs' allegations, (*see* Pls.' Mem. 7–14), the reduction of non-essential assignments was only one strategy encompassed in S.B.'s 2011-12 IEPs, (*cf., e.g.*, J-4).

[14] While Plaintiffs acknowledge this participation in their reply, they nonetheless argue that "[a] team meeting is not a substitute for a properly convened CSE meeting."  (Pls.' Reply 2.)  However, Plaintiffs have offered no authority supporting such a distinction in the context of parental participation in the IEP development process, *cf. Dzugas-Smith v. Southold Union Free Sch. Dist.*, No. 08-CV-1319, 2012 WL 1655540, at *27 (E.D.N.Y. May 9, 2012) ("Parental participation requires an opportunity to examine records, participate in *meetings*, and . . . obtain an independent evaluation." (emphasis added) (internal quotation marks omitted)), and the Court sees no logical reason for doing so.

[15] In support of their contention that the "[six]-week trial of reducing writing assignments . . . was never reflected on S[.]B[.]'s IEP," Plaintiffs cite to a single page from Lovallo's testimony.  (Pls.' 56.1 ¶ 46 (citing, inter alia, Tr. 459).)  What her testimony actually indicates, however, is the decision that the six-week trial need not "*immediately* be reflected on an IEP" but could be considered "at an upcoming CSE meeting."  (Tr. 459 (emphasis added).)  Curiously, Plaintiffs also cite to a single page from LoFaso's testimony, (*see* Pls.' 56.1 ¶ 46 (citing, inter alia, Tr. 842)), in which he confirms that the reduction in English and Social Studies homework assignments took place at the CSE level, (*see* Tr. 842).

Plaintiffs separately assert that there was no documentation as to the effectiveness of this reduction in non-essential assignments.  (*See* Pls.' Mem. 10–11.)  While there may not have been "ABC charts" or "plot charts" of relevant data, (*see* Tr. 310, 612), the record demonstrates that various other means of assessment were used.  For example, Lovallo testified that S.B.'s teachers used his grades and classroom performance to measure whether the reduction in work was helpful to S.B.  (*Id.* at 612.)  Much of this evidence points toward some academic progress, which supports the IHO's finding that "the [D]istrict was conscientious in" reducing S.B.'s non-essential writing assignments so as to address S.B.'s needs and "to help [him] move forward with essential assignments."  (IHO Op. 64.)[16]  Indeed, both Jilton and LePage indicated that the reduction in workload helped S.B., (*see* Tr. 2177–79; J-4), and LoFaso also testified to some level of improvement in S.B.'s completion of assignments as a result of the reduction, (Tr. 1143; *see also* D-33 (email from LoFaso indicating S.B. had caught up with his English coursework for the first quarter)).  By the end of the second quarter in January 2012, S.B. had maintained or improved his grades in four of his five core academic classes, and he was no longer in danger of failing English.  (*See* J-18.)  On his report card, Bryant noted that S.B. had shown some improvement over the course of the first two quarters.  (*See id.*; *cf.* J-5.)

Furthermore, as explained by Lovallo and LoFaso, the reduction in S.B.'s workload was not continuous but rather implemented as needed throughout the year.  (*See* Tr. 614–15, 1113.) The IHO acknowledged this pattern, noting that the modification "was not a constant reduction" and, although it went "well beyond the six-week trial," the program of reductions was tailored to

---

[16] While Plaintiffs allege that "there was no way to gauge his true academic progress," (Pls.' Mem. 10), the record reveals that "[S.B.] was still expected to know the same curriculum[,] and he was still being graded in the same way as other students," (Tr. 1100).  Indeed, he was still required "to take all the tests and complete all the assignments."  (*Id.*)

address S.B.'s "cycle" of "inconsistent performance."  (IHO Op. 64.)  Finally, while Plaintiffs

object to the alleged absence of a "documented definition" of which assignments were "non-

essential," (Pls.' Mem. 10), the record reveals that the determination was left to the discretion of

S.B.'s individual teachers, (*see* Tr. 613–14; J-8; *cf.* Tr. 1834–35), to which the Court defers, *see*

*S.B. v. N.Y.C. Dep't of Educ.*, — F. Supp. 3d —, 2016 WL 1271690, at *5 (S.D.N.Y. Mar. 30,

2016) ("[T]eaching methodologies are typically left to the discretion of classroom teachers.").[17]

### iii.  Extra Help

Plaintiffs allege that the extra help made available to S.B. by his English and Global

Studies teachers was ineffective in that it inappropriately placed the onus on S.B. to seek out

assistance.  (*See* Pls.' Mem. 11; Pls.' Reply Mem. of Law ("Pls.' Reply") 3 (Dkt. No. 64).)[18]

The record, however, suggests a pedagogical reason for this arrangement, as Hayes testified that

the "voluntary" nature of the extra help sessions was intended to "ameliorate the pressures that

he felt" and "actually help him to not feel overwhelmed."  (Tr. 303.)  The IHO explained, based

on Hayes' testimony, that the District "wanted [S.B.] to develop self-advocacy skills to work

---

[17] Notably, the October 2012 IEP indicated that "[t]he modifications afforded for
[S.B.] . . . were not above and beyond typical modifications that his teachers provided to other
students."  (J-8.)

[18] Plaintiffs contend that "[t]he District's solution to S[.]B[.]'s inability to access his
education was to offer extra help."  (Pls.' Mem. 11.)  That, however, only tells part of the story,
as the District also offered the "sensible" step of a 15:1 special class in English.  (IHO Op. 66;
*see also* Tr. 476–78.)  Indeed, the IHO noted that S.B.'s "performance at Westfield, where he
was placed in the lower form of English in [twelfth] grade [because] the [eleventh] grade class
had been too challenging for him, confirms the wisdom of the [D]istrict proposal."  (IHO Op. 66
(citing P-QQ).)  Plaintiffs nonetheless maintain that the extra help sessions with S.B.'s teachers
did not work for him, (*see* Pls.' Mem. 11; Pls.' Reply 3), yet they summarily rejected this
alternative strategy on the basis of "largely speculative" concerns about S.B.'s reaction to
enrollment in a special education class, (IHO Op. 66 (citing Tr. 476–79)).  In fact, as noted by
the IHO, (*see id.*), Jilton testified that S.B. never expressed any concern to her about enrolling in
a special education class for English, (Tr. 2223).

directly with the teachers when he was overwhelmed." (IHO Op. 65.) Ultimately, the IHO found that "the plan was inadequate in implementation" but nonetheless concluded that the extra help sessions did benefit S.B. to some extent. (*Id.*)[19] Lovallo testified to this point, even as she noted that S.B.'s teachers felt he did not come to them consistently. (Tr. 465.) Bryant testified to S.B.'s progress in the second quarter as a result of individual extra help sessions with her, (*id.* at 1776–78), and Jilton acknowledged that the "extra support" from Bryant helped S.B. "to organize and plan his papers," (*id.* at 2131–32). Furthermore, S.B.'s progress reports from this time indicate that he was passing every one of his classes, in contrast to the prior quarter. (J-18; *cf.* Tr. 464–65.) The evidence thus confirms that, while flawed in execution, the extra help sessions nevertheless conferred at least some educational benefit. And, in any event, the mere that fact Plaintiffs disagreed with this strategy does not signify that they were deprived of the "opportunity to meaningfully participate in the IEP development process." *Dirocco ex rel. M.D. v. Bd. of Educ.*, No. 11-CV-3897, 2013 WL 25959, at *18 (S.D.N.Y. Jan. 2, 2013) (internal quotation marks omitted).

Having considered Plaintiffs' claims of procedural deficiencies and found them to be without merit, the Court now turns to Plaintiffs' claims of substantive errors.

### b.  Substantive Adequacy

In reviewing for substantive errors, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits. Substantive inadequacy automatically entitles the parents to reimbursement." *R.E.*,

---

[19] The IHO addressed the merits of the extra help plan only after "not[ing] that extra help, although entered on [S.B.'s] IEP, could not be considered a special education service." (IHO Op. 65.)

694 F.3d at 190 (alteration, citations, and internal quotation marks omitted).[20]  As noted above, a district is not required "to provide the very best educational opportunities and services possible, as the purpose of the IDEA is 'more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.'" *J.C. ex rel. C. v. New Fairfield Bd. of Educ.*, No. 08-CV-1591, 2011 WL 1322563, at *19 (D. Conn. Mar. 31, 2011) (quoting *Rowley*, 458 U.S. at 192); *see also C.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933, 2013 WL 1285387, at *8 (S.D.N.Y. Mar. 28, 2013) (noting that an IEP "need only provide the child with a 'basic floor of opportunity'" (quoting *Rowley*, 458 U.S. at 201)).  Additionally, the "special education and related services must be provided in the least restrictive setting consistent with a child's needs." *Walczak*, 142 F.3d at 122.

Plaintiffs argue that the 2011-12 IEPs were substantively inadequate because:  (a) the CSE did not add individual counseling services and did not conduct an FBA; and (b) the District improperly denied Plaintiffs' request for a second resource room.  (*See* Pls.' Mem. 12–14.)

As to the first claim, Plaintiffs contend that "the CSE did not increase S[.]B[.]'s services to include individual counseling[,] nor did it conduct an FBA to develop a BIP . . . ."  (*Id.* at 12 (citation omitted).)  The record, as noted, supports the IHO's decision to credit Lovallo's testimony that an FBA was not warranted prior to spring 2012.  (*See* IHO Op. 66.)  Lovallo specifically testified that S.B.'s work avoidance was not consistent earlier in the 2011-12 school year, (*see* Tr. 480, 986–87), and the testimony of other educators corroborates this view.[21]  For

---

[20] It bears noting that "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."  *Cerra*, 427 F.3d at 195.

[21] Plaintiffs argue that "Lovallo testified that she began to see a decrease in S[.]B[.]'s social/emotional functioning in January 2012 . . . ."  (Pls.' Mem. 8 (citing Tr. 455).)  However, that Lovallo noticed some "change" in S.B.'s social-emotional-behavioral functioning as of

example, Nedell described that as of January 2012, S.B.'s "progress and performance w[ere] strong enough that [an FBA] wasn't something that [the District] considered doing." (*Id.* at 796–97.) McNulty similarly testified that that S.B.'s performance showed "that [he] was learning" during this time. (*Id.* at 221.) In addition, she explained that "th[e] areas of concern were being worked on through S.[B.]'s direct support with the special education teacher and his counseling services." (*Id.*)

The record also refutes Plaintiffs' argument with respect to individual counseling, as prior to the third quarter Lovallo "had been seeing S.[B.] in an individual setting as needed," which became "formal and more regular" after the recommendation at the April 2012 CSE meeting. (*Id.* at 484; *see also* J-6.) Lovallo testified that individual counseling as a direct service was not necessary before the 2011-12 school year because "S.[B.] was progressing in a satisfactory manner at the end of ninth grade," and "his goals could be achieved in a group setting." (Tr. 448.) Nevertheless, over the course of tenth grade S.B. did, in fact, receive school-based counseling both in a group format *and* on an individual basis. (*See id.* at 484–85.) According to Lovallo, the "counseling goals that he . . . had were appropriate" at that time. (*Id.* at 485.)

As a second alleged substantive error, Plaintiffs assert that "the District refused to consider [their] request for a second resource room." (Pls.' Mem. 13.) However, the record not only makes clear that the District did consider that request, (*see, e.g.*, Tr. 463–64; *id.* at 2302–

---

January 2012, (Tr. 455; *see also id.* at 453), by no means suggests that she observed any interference with his ability to access his education. Plaintiffs' implication notwithstanding, (*see* Pls.' Mem. 8 (asserting that Lovallo's observations occurred "months before declining to perform an FBA in March 2012")), Lovallo's testimony is not inconsistent with her decision against conducting an FBA in March 2012, *see M.W.*, 725 F.3d at 140 ("The IDEA only requires a school district to 'consider the use of positive behavioral interventions and supports, and other strategies' when a child's behavior impedes learning." (quoting *A.C.*, 553 F.3d at 172)).

05), but also supports the IHO's determination to "credit the [CSE's] decision not to add a second resource room," (IHO Op. 64; *see also* SRO Op. 15 (adopting the IHO's finding that "the [D]istrict reasonably declined to recommend additional resource room services")).  According to Lovallo, the CSE felt that a second resource room would not be advantageous because "at the time [S.B.] was already spending his free periods in the resource room . . . and he was not using that time productively."  (Tr. 464.)  The April 2012 IEP notes LoFaso's concern that the addition of a second resource room would "not address the underlying issues that [we]re overwhelming [S.B.]," since S.B. already came to the resource room "several times a day" but was "not productive."  (J-6.)  It was decided, instead, "that both his English and Global Studies teachers would offer S.[B.] consistent extra help."  (Tr. 465.)  Even if the Court "were inclined to disagree with the IHO's conclusions regarding the appropriateness of [an additional resource room], questions of class size, teaching methodologies[,] and educational environments involve exactly the types of educational policy issues that require district court deference to state administrative agencies."  *N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-5120, 2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011); *see also Mr. & Mrs. P.*, 546 F.3d at 118 ("Independent judicial review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'" (quoting *Rowley*, 458 U.S. at 206)).[22]

---

[22] In further support of their argument that the 2011-12 IEPs were not reasonably calculated to confer educational benefit on S.B., Plaintiffs argue that Egnal's report and testimony are entitled to deference.  (*See* Pls.' Mem. 13–14.)  However, Egnal only evaluated S.B. as of May and June 2012, (*see* J-22), months *after* the IEPs at issue here, (*see* J-3; J-4; J-5; J-6).  Because an "IEP must be evaluated prospectively as of the time of its drafting," *R.E.*, 694 F.3d at 186; *see also C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 79 (2d Cir. 2014) (explaining that an "IEP must be evaluated prospectively, without recourse to retrospective testimony"), Plaintiffs' reliance on Egnal's evaluations in challenging the adequacy of an IEP that predated them is misplaced.

Moreover, as noted by the IHO, Plaintiffs offered no sound pedagogical justification for a second resource room.  (*See* IHO Op. 64 ("I credit the committee decision not to add a second resource room, for which no sound educational reason was advanced."); *id.* at 65 ("[T]here was no educational reason provided to the CSE [in support of the proposal for a second resource room].").)  Indeed, the only reason proffered was a hope that a different resource teacher would be helpful to S.B., not a belief that an *additional* resource room necessarily would be beneficial.  (*See* Tr. 2134, 2215–16.)  Any dissatisfaction with LoFaso, however, was never expressed to the District prior to this case, (*see id.* at 2418–19; *cf.* IHO Op. 65 ("[T]here was no evidence that this dissatisfaction was ever communicated to the [D]istrict, other than a single mention by [J.B.] to . . . Lovallo . . . .")), such that the CSE cannot be charged with failing to act, *see R.E.*, 694 F.3d at 186 (holding that an IEP must be evaluated "prospectively as of the time of its drafting").

Having reviewed the record, the Court finds substantial evidence confirms the SRO's determination that the District provided S.B. a FAPE for the 2011-12 school year.

## 2.  Whether the IEPs Offered S.B. a FAPE for the 2012-13 School Year

The SRO also affirmed the IHO's conclusion that the District designed and implemented appropriate IEPs throughout the 2012-13 school year.  (SRO Op. 14 (citing IHO Op. 63–72).)  Specifically, the IHO found that:  (a) an FBA/BIP had been developed along with new goals concerning avoidant behaviors and dealing with stress, and J.B. agreed with the 2012-13 program as recommended at the June 2012 CSE meeting, (IHO Op. 68); (b) the CSE adopted a number of recommendations made by Egnal, (*id.*); and (c) the CSE's recommendation for special classes, with a 15:1 student-to-teacher ratio, was appropriate and consistent with Egnal's recommendation for a small, structured class setting, (*id.* at 68–69).  The SRO also addressed in greater detail Plaintiffs' claim that the District failed to implement the BIP during the 2012-13

school year, determining that:  (a) the District did implement the BIP for the portion of the school year that S.B. attended the public school; (b) the District sought Plaintiffs' assistance in implementing the BIP during that time, but they were not amenable to participating in the process; (c) Lovallo reviewed the BIP with S.B.'s teachers and guidance counselor; (d) the 2012-13 BIP was amended from the year prior, with minor changes made regarding strategies and interventions for S.B.; and (e) though Plaintiffs were not receptive, Lovallo did seek to involve them in developing appropriate rewards for S.B.  (SRO Op. 15–16.)

### a.  Procedural Adequacy

Plaintiffs argue that the SRO wrongly affirmed the IHO's "finding that the 2012-13 FBA/BIP was appropriately written and implemented during [S.B.'s eleventh grade] year." (Pls.' Mem. 14 (citing SRO Op. 15).)

As an initial matter, ample evidence supports the SRO's conclusion "that the [D]istrict implemented [S.B.'s] BIP for the 2012-13 school year at the start of said school year."  (SRO Op. 15.)  Lovallo testified that the BIP was implemented during the five weeks S.B. attended school in the District in fall 2012, (Tr. 521–23, 1025), and the fact she could not recall the exact date "specifically offhand" does not undermine her testimony, (*id.* at 1025).[23]  J.B.'s own testimony corroborates this point, indicating that Lovallo contacted her at the start of the school year with regard to an appropriate reward for S.B. for use in the BIP and thereby suggesting that Plaintiffs understood the plan to have been implemented.  (*See id.* at 2363–64 (testifying she knew the BIP "was started" because "Lovallo called . . . at the beginning of the year about it").)

---

[23] Plaintiffs assert that "Lovallo could not recall when the BIP was implemented."  (Pls.' Mem. 14 (citing Tr. 953).)  However, the cited page from her testimony unrelatedly concerns Lovallo's inability to "recall the specific reason as to why the CSE meeting was called" on January 31, 2012.  (Tr. 953; *cf.* J-5.)

The record also contradicts Plaintiffs' contention that the revised 2012-13 BIP was inappropriate. As discussed by the SRO, (*see* SRO Op. 15), Lovallo reviewed the BIP with S.B.'s then-current English, mathematics, Latin, science, and resource room teachers, as well as with his guidance counselor, at the start of his eleventh grade year, (*see* Tr. 518–21; D-45).[24] The plan had been amended from the one developed at the end of the previous school year, with what Lovallo considered "minor changes . . . in terms of strategies and interventions." (Tr. 521; *compare* D-6, *with* J-21.) The SRO articulated the specific adjustments that were made in order to meet S.B.'s needs at the beginning of the 2012-13 school year. (SRO Op. 16 n.14 (citing Tr. 526–33).) These changes included: elimination of the "work plan" in an effort not to draw attention to S.B. that might make him uncomfortable in his general education classes, based on the input of his then-current teachers, (Tr. 527); clarifying the system of rewards whereby S.B.'s special education teacher would monitor the points and Plaintiffs would implement the rewards, (*id.* at 528–29); modification of the "time away" plan to reflect that S.B. spent most of his time with the school psychologist and his classroom teachers, rather than with the assistant principal or school counselor, and that the strategy "was more appropriate to utilize . . . in school," (*id.* at 531–32); and the addition of outside providers as persons responsible for implementing the

---

[24] Plaintiffs charge that Lovallo "did not recall consulting with Jilton" about the 2012-13 BIP, (Pls.' Mem. 14 (citing Tr. 975)), but, again, the provided citation has no bearing on their argument, (*see* Tr. 975 (discussing LoFaso's charting of S.B.'s behaviors in spring 2012)). In their reply, Plaintiffs cite to a different part of the transcript, (*see* Pls.' Reply 6 (citing Tr. 1047)), which merely indicates that Lovallo did not "recall specifically" whether she again consulted with Jilton when she revised the BIP at the beginning the 2012-13 school year, (Tr. 1047–48). Yet, various portions of Lovallo's testimony suggest that the revised BIP reflected Jilton's input. (*See, e.g.*, *id.* at 532 (noting that the BIP was amended to reflect that Jilton "was also working with [S.B.] on [certain matters]"); *id.* at 1011 (testifying that she spoke with Jilton about the use of rewards "to help create some buy in [to the BIP]").)

sections involving "psychoeducation," "contingency management," and "problem solving," (*id.* at 532–33).

As to the matter of rewards, Plaintiffs argue that it was inappropriate for the District to ask them to fashion and implement a system of rewards at home.  (*See* Pls.' Mem. 14–15; Pls.' Reply 6.)  While Plaintiffs may have struggled with this strategy (but offered no alternative), (*see* Tr. 528–29, 2364–65), their disagreement with the methodology does not constitute a procedural violation, *see S.W. v. N.Y. Dep't of Educ.*, 92 F. Supp. 3d 143, 157 (S.D.N.Y. 2015) ("The IDEA grants parents the right to provide input, not to have veto power."); *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("A professional disagreement is not an IDEA violation."); *Sch. For Language & Commc'n Dev. v. N.Y. State Dep't of Educ.*, No. 02-CV-269, 2006 WL 2792754, at *7 (E.D.N.Y. Sept. 26, 2006) ("Meaningful participation does not require deferral to parent choice.").[25]  Indeed, notwithstanding Plaintiffs' unreceptiveness "to the [D]istrict's attempt to refine [S.B.'s] BIP and, thus, reward his success in school," (SRO Op. 16 (citing Tr. 2364); *see also* Tr. 2364 (testimony by J.B. that she told Lovallo it was "silly" to ask Plaintiffs to come up with a reward)), Lovallo's testimony offers pedagogical justification for the rewards system, (*see* Tr. 529, 1011), which the SRO credited in finding the 2012-13 BIP adequately implemented, (*see* SRO Op. 16).  This the Court will not second guess.  *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[T]he sufficiency of goals and

---

[25] Moreover, notwithstanding Plaintiffs' implication to contrary, (*see* Pls.' Mem. 14–15), the District did not leave the implementation of the rewards system to Plaintiffs alone, as, for example, Lovallo met with "S.[B.] for a counseling session to talk about it, to ascertain his resistance," and "to brainstorm with [him]" about how to help, (Tr. 1013).

strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.").[26]

Plaintiffs also allege that "the IEP and the revised BIP are silent as to monitoring progress of the frequency, duration[,] and intensity of the behavioral interventions."  (Pls.' Mem. 14 (citing J-7; D-6).)  That contention, however, is simply inaccurate.  The BIP expressly identifies that the "intervention will be measured through the use of behavior report cards and grades," designates the persons responsible for the collection of that data (i.e. S.B.'s special education teacher along with his regular education teachers and counselor), and sets out a schedule to review the plan.  (*See* D-6.)  While the information provided is somewhat cursory and unquantified, any such technical defect does not render S.B.'s 2012-13 IEP procedurally inadequate.  *See K.M. v. N.Y.C. Dep't of Educ.*, No. 13-CV-7719, 2015 WL 1442415, at *15 (S.D.N.Y. Mar. 30, 2015) (finding that an allegedly inadequate BIP did not result in the denial of a FAPE because, "although th[e] document did not contain the required data on the 'frequency, duration, [and] intensity' of [the student's] interfering behaviors, it clearly went beyond simply listing behaviors and strategies in a non-differentiated manner" (second alteration in original) (citation and some internal quotation marks omitted) (quoting NYCRR tit. 8 § 200.22(b)(4)(i))).  Plaintiffs further complain that "the Behavior Report Cards are not consistently completed[,] in violation of . . . § 200.22(b)(5)."  (Pls.' Mem. 14 (footnote omitted) (citing P-O).)  Plaintiffs, however, provide no legal support for this leap from seemingly incomplete progress reports to failed monitoring.  *Cf.* NYCRR tit. 8 § 200.22(b)(5) ("The results of the progress monitoring [of a student's BIP] shall be documented . . . .").  Moreover, they wholly ignore the (not unlikely)

---

[26] The Court does pause to note that the rewards system is only one of a number of strategies set forth in the BIP to help address S.B.'s behavior.  (*See* J-21; D-6.)

possibility that these blank spaces may reflect S.B.'s absences or that a particular class did not

convene on a given day.  In fact, one of the Behavior Report Cards explicitly notes S.B. was

absent on October 1, 2012, (*see* P-O), and Lovallo testified that his "attendance was not stellar"

at the start of the 2012-13 school year, (Tr. 518).

Aside from this challenge to the appropriateness of the 2012-13 BIP, Plaintiffs assert that

"[the District] suggested that S[.]B[.] enroll in a special class [for English], but J[.]B[.] needed

more information."  (Pls.' Mem. 15 (citing, inter alia, Tr. 183; *id.* at 421; *id.* at 2509; *id.* at

2560).)  Not only is this statement ambiguous as to which CSE meeting it refers, but also the

testimony cited does not support the proposition.  (*See* Tr. 183 (testimony by McNulty regarding

speech and language therapy services in spring 2010); *id.* at 421 (testimony by Hayes about

behavioral data presented at the June 2012 CSE meeting); *id.* at 2509 (index for J.B.'s

testimony); *id.* at 2560 (testimony by LePage that she and J.B. visited the special class on

December 2, 2012).)  Plaintiffs more specifically contend that "[the District] did not provide

Plaintiffs with an opportunity to visit the [s]pecial [c]lass" during spring 2012, and, as a result,

"they rejected it."  (Pls.' Mem. 15 (citing, inter alia, Tr. 2359; *id.* at 2415; *id.* at 2558).)  Yet, this

distorts the record, which plainly shows that the CSE discussed the special English class at the

meeting on April 13, 2012 (Friday), (*see* J-6), and on the morning of April 18, 2012

(Wednesday), J.B. wrote to Hayes to decline placement, (*see* D-16; *cf.* Tr. 256).  Plaintiffs offer

no evidence that they requested—let alone were denied—an opportunity to visit the special class

within that short timeframe.  (*Cf.* J-6 (noting only that S.B. and J.B. "will consider whether or

not to switch to [the] special class"); J-7 (including no mention of a special class for English).)

Quite the opposite, Plaintiffs once again cite testimony not relevant to their argument.  (*See* Tr.

2359 (testimony by J.B. regarding an email exchange in September 2012); *id.* at 2415 (testimony

34

by J.B. regarding her communication with LoFaso after the CSE meeting in January 2012); *id.* at

2558 (testimony by LePage that the CSE would not consider Egnal's input about the special

class that she had not visited).)

After placement in a special class was again discussed at the October 2012 CSE meeting,

(*see* J-8), J.B. was provided an opportunity to visit the classroom with LePage and Hayes, (*see*

Tr. 271, 2372–73, 2481–82). Thereafter, the only feedback J.B. provided Hayes was that S.B.

would never return to the public school. (*See id.* at 271; *cf.* J-8 (noting "it was the family's

intention to have him continue [at Westfield]").)[27]  In their reply, Plaintiffs assert that "[J.B.]

determined it was inappropriate for S[.]B[.] because [he] would still have to navigate the high

school hallways for the rest of his classes, which had historically overwhelmed him."  (Pls.'

Reply 6.)  However, the IHO found these observations "irrelevant" to the sufficiency of S.B.'s

IEP because Plaintiffs had removed S.B. from the District prior to that visit.  (IHO Op. 70.)

In light of this record, the Court cannot find that a procedural violation took place, much

less one that "resulted in the IEP's substantive inadequacy or affected the decision-making

process."  *M.W.*, 725 F.3d at 139.

### b.  Substantive Adequacy

Plaintiffs challenge the SRO's decision that the IHO correctly found the 2012-13 IEP to

be appropriate.  (*See* Pls.' Mem. 16–17.)  Claiming substantive deficiencies, Plaintiffs argue that

---

[27] J.B. testified that at no time during or after the visit did she state that S.B. would never
return to the District.  (Tr. 2373–74.)  However, in her detailed decision, the IHO found that
"[t]here was no credible evidence that [Plaintiffs] were at any time considering re-enrolling
[S.B.] in [the public school]."  (IHO Op. 70.)  The Court defers to this credibility determination.
*See M.H.*, 685 F.3d at 258 ("The IHO's determination was based on his assessment of the
credibility of the witnesses testifying before him . . . .  It was entitled to deference on that
basis."); *P.F. v. Bd. of Educ.*, No. 15-CV-507, 2016 WL 1181712, at *6 (S.D.N.Y. Mar. 25,
2016) ("[W]hen the hearing officer had [an] opportunity to see and hear witnesses, his or her
credibility determination is accorded deference.").

the program offered by the District for S.B.'s eleventh grade year "was not sufficiently tailored to his needs to enable him to progress and thus he regressed." (*Id.* at 17 (citing, inter alia, Tr. 2106).)[28]

The record, however, belies this claim of regression. According to Hayes' testimony, S.B.'s teachers reported that he started eleventh grade "on a positive note" academically. (Tr. 269; *see also id.* at 270 ("[H]e seemed to be off to a good start.").) At that time, S.B. expressed that he had a better plan to negotiate the school curriculum. (*See id.* at 269–70.) While Plaintiffs claim that S.B. "was afraid of his English teacher Lewis," (Pls.' Mem. 16 (citing Tr. 2513)), this bare assertion not only is unsupported by evidence, (*see* P-FFF (noting J.B.'s concerns about S.B.'s ability to successfully complete the English course)), but also is contradicted by S.B.'s statements to Lovallo that he thought Lewis was a "good teacher" who "explained things good," even as he anticipated that the course would be difficult, (P-Q).[29] Moreover, the District had expanded the program modification of extended time for S.B.'s long-term assignments to other core area subjects in order to reduce pressure on S.B. and lessen his anxiety. (*See* Tr. 266; J-7.)

There is some conflicting testimony regarding S.B.'s social and emotional functioning at the start of his eleventh grade year. On one hand, at the October 2012 CSE meeting Jilton noted that "[S.B.'s] anxiety remained high," "he was still very vulnerable to depression," and "[h]e still

---

[28] In reality, the testimony cited here discusses Jilton's use of cognitive behavior therapy to address S.B.'s anxiety. (*See* Tr. 2104–06.) This is a far cry from evidence supporting Plaintiffs' claim that "[a]t [the public school], S[.]B[.] went through failure, despondency, confusion, anxiety[,] and depression." (Pls.' Mem. 16–17 (citing, inter alia, Tr. 2106).)

[29] Plaintiffs yet again cite to testimony wholly unconnected to the stated proposition. (*Compare* Pls.' Mem. 16 ("He was afraid of his English teacher Lewis and was not going to see him for extra help . . . . J[.]B[.] did not believe Lewis went to S[.]B[.]'s resource room to help S[.]B[.]."), *with* Tr. 2294 (discussing J.B.'s and S.B.'s participation in the June 2011 CSE meeting), *and id.* at 2296 (discussing S.B.'s tenth grade year), *and id.* at 2513 (index for J.B.'s testimony).)

36

had not made social progress with any friends." (Tr. 2151). On the other hand, Lovallo testified

that "generally [S.B.] was in better spirits than he had been the previous year." (*Id.* at 518; *see*

*also id.* ("[J]ust his mood, his affect was more positive.").) According to Hayes' testimony,

"Lovallo reported that S.[B.] was starting off in a good place," (*id.* at 270), with respect to the

individual counseling that had been added to S.B.'s 2012-13 IEP to address his increased

anxiousness and formalize the support she had given at the end of the previous school year, (*see*

*id.* at 264; *see also id.* at 518 (testifying that "[h]e seemed more available for counseling" and

was better able to engage with Lovallo)). Here, the Court defers to the IHO's determination to

"credit . . . Lovallo's opinion that the [District] provided the appropriate level [of] support for

[S.B.]," (IHO Op. 68), as it is not for a federal court to "cho[ose] between the views of

conflicting experts on a controversial issue of educational policy. . . in direct contradiction of the

opinions of state administrative officers who had heard the same evidence," *Grim*, 346 F.3d at

383; *see also Y.S. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2590, 2013 WL 5722793, at *9

(S.D.N.Y. Sept. 24, 2013) (declining "to choose between conflicting opinions of educational

experts" and instead "defer[ring] to the [SRO's] conclusion").

In support of their challenge to the SRO's determination regarding the 2012-13 IEP,

Plaintiffs re-emphasize Egnal's reports and testimony. (Pls.' Mem. 16.)[30] This reliance,

---

[30] Plaintiffs argue that the testimony and opinions of both Egnal and Jilton "support the conclusion that the IEP was not sufficiently tailored to S[.]B[.]'s needs to enable him to progress." (Pls.' Mem. 16 (citing Tr. 4043).) No such page for the impartial hearing transcript exists, leaving the Court unclear as to the existence of evidence to corroborate this contention. That confusion is not helped by the fact that most of the citations in this section of Plaintiffs' brief do not actually support the propositions for which they are put forth, (*see, e.g.*, Tr. 1871 (index for Bryant's testimony); *id.* at 1972 (describing S.B.'s final report card from ninth grade)), an all-too-common trend throughout their papers.

In any event, it bears noting that Jilton conceded she was not familiar with IEPs in general and had no experience with a 15:1 English class. (*See* Tr. 2222–23.) Egnal's similar lack of familiarity is discussed below.

however, is misguided.  For one, the District adopted a number of the recommendations in Egnal's 2012 report, including speech and language therapy, access to a word processor/computer, and flexible testing scheduling.  (*See* Tr. 270–73, 2370; *compare* J-8, *with* J-22.)  Additionally, as the IHO noted, (*see* IHO Op. 68–69), the October 2012 CSE meeting recommendation for special classes in English and Social Studies, with 15:1+1 student-to-teacher-to-aide ratios, (*see* J-22), was consistent with Egnal's recommendation for a "small, structured, nurturing setting with a high teacher/pupil ratio," (*see* J-8).[31]  Yet in spite of this, Plaintiffs underscore that Egnal determined the 2012-13 IEP to be not appropriate.  (*See* Pls.' Mem. 16; Pls.' Reply 5–6.)  Though she testified that the 15:1+1 classes would be unsuitable due to its size, (*see* Tr. 2010), Egnal never expressed that opinion at a CSE meeting, (*see* IHO Op. 69), nor did she identify a maximum student-to-teacher ratio that would be appropriate, (*see* Tr. 1940).  Moreover, Egnal conceded not only that she had never visited the special classes recommended by the District, (*see id.* at 2010), but also that she did not "have a full understanding" of the composition of a 15:1+1 class, (*id.* at 2009; *see also id.* at 2010–11).  In defending this lack of familiarity, she merely asserted that she knew "how a public school works," "hav[ing] seen enough of them."  (*Id.* at 2067).  The record thereby supports the IHO's discounting of her testimony on the basis that she "preferr[ed] to base her statement that the [D]istrict couldn't provide a placement for [S.B.] at the level he needed on her feeling about all public schools."  (IHO Op. 69.)

Egnal also testified that the 5:1 resource room was not suitable for S.B. as "too fractionated," (Tr. 2035), and not part of "an immersion program," (*id.* at 2013).  However, she

---

[31] The IHO further noted that Egnal's "report did not specify a small school, nor was there any exclusion in the report from a setting within a larger school."  (IHO Op. 69; *cf.* J-22.)

never expressed that opinion at the October 2012 CSE meeting, (*see* IHO Op. 69), and, to reiterate, evaluation of the IEP is limited to what was before the CSE at that time, *see R.E.*, 694 F.3d at 186; *R.B. v. N.Y.C. Dep't of Educ.*, No. 12-CV-3763, 2013 WL 5438605, at *11 (S.D.N.Y. Sept. 27, 2013) ("[B]ecause this testimony was not available at the time of the CSE meeting, it is inappropriate for the [c]ourt to consider it at this time."), *aff'd*, 589 F. App'x 572 (2d Cir. 2014).  Such testimony thus carries no weight here.

Based on the record, the Court finds the evidence amply supports the SRO's conclusion that the 2012-13 IEP was substantively adequate.  It thereby reaffirms that the District offered S.B. a FAPE for the 2012-13 school year.

### 3.  Whether the IEPs Offered S.B. a FAPE for the 2013-14 School Year

Lastly, the SRO affirmed the IHO's determination that the District offered S.B. a FAPE for the 2013-14 school year.  (*See* SRO Op. 16.)  The SRO adopted "the findings and conclusions of the IHO relating to the design and implementation of [S.B.'s] IEPs," (*id.* at 15), which included:  (a) the new information before the CSE, in the form of progress reports from Westfield, updated evaluations performed by the District, and Egnal's updated testing, did not warrant a change to S.B.'s program, (IHO Op. 70); and (b) the 2013-14 IEP goals for S.B. were appropriate, based upon the reevaluations performed by the District, (*id.* at 71).

#### a.  Procedural Adequacy

Plaintiffs argue that "[the District] significantly impeded [their] opportunity to participate in the decision-making process" by failing to timely conduct reevaluations of S.B. at the end of the 2012-13 school year.  (Pls.' Mem. 17.)  The IHO determined, and the SRO agreed, that this issue was not raised in Plaintiffs' due process complaint, (*see* IHO Op. 71; SRO Op. 14), which precludes review by this Court, *see, e.g.*, *B.M. v. N.Y.C. Dep't of Educ.*, No. 12-CV-3247, 2013

WL 1972144, at *6 (S.D.N.Y. May 14, 2013) ("[A] parent's failure to raise an IDEA claim in his

or her due process complaint deprives a court of subject-matter jurisdiction to address the

claim."), *aff'd*, 569 F. App'x 57 (2d Cir. 2014); *B.P. v. N.Y.C. Dep't of Educ.*, 841 F. Supp. 2d

605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and

th[e] [c]ourt, is limited to matters either raised in the [p]laintiffs' impartial hearing request or

agreed to by [the] [d]efendant.").[32]  Plaintiffs do not dispute this point here.  Rather, in their

reply, as in their appeal of the IHO's decision, (*see* SRO Op. 14), Plaintiffs seek to overcome this

jurisdictional hurdle by arguing that "[t]he District opened the door to the issue of late

evaluations," so they "cannot be precluded from raising that issue on appeal," (Pls.' Reply 6).

As recognized by the SRO, "the [D]istrict solicited testimony on this issue as background

information relevant to the provision of [a] FAPE . . . during the 2013-14 school year . . . ."

(SRO Op. 14; *cf.* Tr. 1538–40; *id.* at 1544–46.)  This Court similarly finds that the District did

not "open[] the door" to Plaintiffs' claim because "at the impartial hearing [it] merely offered

background and foundation testimony about the [late evaluations]."  *J.C.S. v. Blind Brook-Rye*

*Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL 3975942, at *9 (S.D.N.Y. Aug. 5, 2013); *see*

*also B.M.*, 569 F. App'x at 59 (finding that the district had not "opened the door" because "the

[d]istrict's only mention of the [issue] at the hearing came during foundational questions, not in

support of an affirmative, substantive argument"); *A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964

F. Supp. 2d 270, 283–84 (S.D.N.Y. 2013) (concluding that the defendant had not opened the

---

[32] The IDEA provides that the party requesting a due process hearing "shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  Along similar lines, "[a]ny party aggrieved by the findings and decision made" in a due process hearing then has "the right to bring a civil action *with respect to the [due process] complaint presented*."  20 U.S.C. § 1415(i)(2)(A) (emphasis added).

door "given the isolated references to the [issue] in a lengthy hearing and the lack of any indication that the [defendant] raised the issue to obtain a strategic advantage") *cf. P.G. v. N.Y.C. Dep't of Educ.*, 959 F. Supp. 2d 499, 515 (S.D.N.Y. 2013) (noting the Second Circuit has found that a defendant "opened the door . . . when it raised the issue in its opening argument and elicited testimony about it from one of its witnesses on direct examination" (citing *M.H.*, 685 F.3d at 250–51)). Therefore, the Court lacks jurisdiction to consider this alleged procedural violation.[33]

### b. Substantive Adequacy

Plaintiffs contend that the 2013-14 IEP was substantively inadequate on the basis that it "did not significantly change" from prior programs, despite S.B.'s claimed progress at Westfield during the 2012-13 school year. (Pls.' Mem. 17–18 (citing J-8; J-40).) There is no dispute that the recommended services, goals, modifications, and testing accommodations contained in the August 2013 IEP remained the same, with the exception of removing the Social Studies special class and revising speech goals. (*See* SRO Op. 4 (citing J-40); *compare* J-40, *with* J-8.)[34] The IHO found the 2013-14 IEP appropriate, having concluded that the information presented to the CSE at its June and August 2013 meetings did not warrant additional changes. (*See* IHO Op. 70.) The SRO then adopted this conclusion. (SRO Op. 15.)

---

[33] In any event, the Court shares the SRO's view that the evidence supports the IHO's determination that Plaintiffs were at least partly responsible for the delay in the evaluations of S.B. (*See* SRO Op. 14 (citing IHO Op. 71); *cf.* J-31 (noting that "[Plaintiffs] did not want [S.B.] to miss school for reevaluation testing"); P-QQ (explaining that J.B. was "trying to delay any testing so it won't interfere with [S.B.'s] school work or Regents, etc.").)

[34] Plaintiffs conclusorily allege that the "revised speech goals . . . were inappropriate because they were not clearly defined or measured." (Pls.' Mem. 18.) This bare allegation warrants no more than footnote, as the August 2013 IEP provides a clear definition of the speech/language goals along with criteria, methods, and a schedule to measure S.B.'s progress. (*See* J-40.)

Even beyond the substantial deference owed to the state administrative officers on this question of educational policy, *see Cerra*, 427 F.3d at 191, the Court notes that this decision finds ample support in the record.  Heldman and J.B. testified that S.B. underwent positive changes while at Westfield, (*see, e.g.*, Tr. 1396; *id.* at 2374; *id.* at 2378–81; *id.* at 2390–91), but Plaintiffs' claims of "meaningful progress," (Pls.' Mem. 18), are controverted by other testimony and reports, (*see, e.g.*, Tr. 1400; *id.* at 1652; P-OO; P-DDD).  For example, Anderson testified that S.B.'s teachers at Westfield reported "concerns related to his completion of homework assignments, his ability to participate and communicate in class," and his difficulty with writing and mental arithmetic.  (Tr. 1652.)[35]  Based on that information, her testing of S.B., an updated evaluation from Egnal, and a report from S.B.'s treating psychiatrist, Anderson determined that the counseling goals of the 2013-14 IEP appropriately related to S.B.'s functioning and did not need to be changed.  (*See id.* at 1652–53.)  Hayes similarly testified that, while J.B. "verbally reported" improvement at the June 2013 CSE meeting, (*id.* at 1559), the information provided "didn't substantiate any changes" in S.B.'s program, (*id.* at 1560).

Accordingly, like both the IHO and the SRO, the Court finds no substantive errors in S.B.'s 2013-14 IEP.  The evidence supports the determination that the District offered S.B. a FAPE for the 2013-14 school year.[36]

---

[35] Anderson evaluated S.B. in June 2013, having been told that Plaintiffs requested a different evaluator than Lovallo.  (*See* Tr. 1633–1634; J-35.)

[36] Because this Court agrees with the SRO that the 2011-12, 2012-13, and 2013-14 IEPs were not procedurally or substantively inadequate, it need not address whether Westfield was an appropriate placement or whether the equities favor tuition reimbursement.  *See M.C.*, 226 F.3d at 66 ("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question."); *M.H. v. N.Y.C. Dep't of Educ.*, No. 10-CV-1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) (affirming "the SRO[']s decision as to the appropriateness of the IEP" and thus declining "to consider the arguments relating to whether [the private school] constitute[d] an appropriate placement and whether the equities favor reimbursement").

## III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied. The

Clerk of Court is respectfully requested to terminate the pending Motion. (Dkt. No. 55.)[37]

SO ORDERED.

DATED:     September 14, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[37] In light of this ruling, the Parties are to inform the Court within one week as to why judgment should not be entered in favor of the District.